Hash, C. J.
 

 The plaintiff claims the slaves in question, under the will of her father, Joseph Allen, sr., and the prayer is, that the deeds from her father to the defendant, Joseph Allen, jr., under which he claims the same slaves, may be called in and cancelled, and he decreed to surrender- them to the plaintiff, and account for the hires, and for general relief. The bill alleges that the deed exhibited by the defendant Allen is a forgery, or, if it was executed by the old man, it was obtained from him by fraud, and by practising on his fears. The first question to dispose of, is the one as to the admissibility of the deposition of the
 
 *26
 
 other defendant, Edwards, the administrator with the will annexed of Joseph Allen, sr. The rule is well settled, that, where a plaintiff in equity reads, in evidence, the answer,of a defendant, there can be no decree against him. To this rule, there is this exception: that when the party has no interest, he may be examined. Edwards has no interest whatever in this controversy, as is manifest from the proceedings ; but is made a
 
 party pro forma,
 
 being the representative of the testator: no decree can be had by the plaintiff -■against him. Adams’ Eq. -364-’5. But it is insisted by the defendant Joseph Allen, jr., that the plaintiff, by his own act, having discharged his co-defendant, has discharged him. This is upon the ground that Edwards is primarily ansAverable to the legatees. It is certainly true, that whatever discharges the party, primarily accountable, will discharge those who are secondarily so : for the reason, that the first is answerable over to the second, and it is unreasonable that the claim in the first place should' be inforced against him, who, though answerable, will be compelled to instituto another suit against him, who stands before him. and who is answerable, in the first instance; and equity abhors multiplying suits unnecessarily, but chooses to settle all the disputes between those interested in the subject matter when it can ho done, and in its decrees always direct that the decree shall be performed by the party first liable, if he can perform it; and if not, by the party who is subsidiary. When, therefore, one is entitled to a .contribution from another or to an actual indemnity, the latter must be made a party; therefore, a bill cannot be sustained against a surety without joining the principal. Adams’ Eq. 319; Brooks v. Stewart, 1 Beam. 512. If the party examined is primarily liable, the examination is an eqitable release to both parties. 1 Ired. Eq. 290 ; Burton v. Stamper, G Ired, Eq. 14. If he is not answerable to the other defendant, ho is discharged, but not his' co-defendant. Adams
 
 *27
 
 865. The answer of Joseph Allen, as we shall show in the further examination of this case, shows that he has no claim upon Edwards, either personally or as the representative of his father.
 

 A question is raised by the bill, which wo will dispose of first. It is charged that, at the timo the alleged bill of sale for the negroes in controversy was made, if at all, from Joseph Alien, sr., the old man, from weakness of mind, was not competent to make a contract. The proof does not sustain the allegation. He was old and weakened in mind and body, from ago and disease, but the proof does not show that it was to' that degree as to render him incompetent to make a contract.
 

 In his answer, the defendant Joseph Allen states, that, finding, contrary to his advice, his father would become the bail of his brothers Charles and Henry, he determined to settle his accounts with him. His language is, “ and fearing the consequences, this defendant
 
 demanded
 
 a
 
 fair
 
 settlement of accounts with the testator, upon which settlement test; tor was found indebted to this defendant in the sum of fourteen hundred and twenty-five dollars, for which defendant
 
 insisted
 
 that he should execute a bond and confess a judgment at law upon it, or pay the money ; that the bond was executed on the 17th of Ecbruary last (1849), and on the same clay, hut after the execution of the bond, upon reflection, the testator proposed to take up the bond, and in consideration thereof to execute to this defendant a conveyance of the negroes Frank, &c., and at the samo time it -was stiptdated that the testator should live the residue of his days with the defendant, who was to attend to him in .such a manner as might
 
 ho
 
 suitable to his age and infirmities.” The answer also states, “that, to the best of defendant’s memory, Samuel Allen and Elijah Allen were present, and possibly others, when the said bill of sale was executed : whether .anybody besides the panties to it wrnre present, he
 
 *28
 
 does not remember. And again, it alleges that the sum of fourteen hundred and twenty-five dollars was made up, in the greater part, by the payments of money made by the defendant at various times for his father, and the residue of the said indebtedness arose from articles for himself and family, such as bacon, &c., and/or
 
 services and personal attentions bestowed upon, and to be rendered during the remainder of Ms life.”
 
 This statement of the answer has some of the strongest badges of fraud upon its face, and
 
 I
 
 should have no hesitation in granting the plaintiff a decree for the negroes, and an account, upon it alone. The alleged bill of sale bears date the 17th of February, 1849, and the answer is sworn to the 3d of November in the same year— eight months. Can it be believed that, in that short time, the defendant had forgotten whether any person was present but the parties? The veil attempted to be thrown around this part of the transaction is too thin to deceit e any one. It is evident that no one was present but Samuel Allen, the brother of the defendant. Again, in the statement of the alleged settlement, he is careful not to make any averment of a settlement. Upon this point, if false, an indictment against him could not have been sustained. In the statements, he gives uS no information as to the bond or the sum alleged to have been found due; whether he retained it or gave it up to his father ; and in the absence of such averment, we should be at liberty, in such .a case as this, to presume it had been retained by him. The defendant denies,, that, to obtain the deed, he used any influence. Influence is of different kinds, and when used for a nefarious purpose, is equally powerful to control the will. The influence may be of fear, apprehension and importunity. What were his declarations, as stated by himself ? He
 
 demanded
 
 a fair settlement of their account, and
 
 insisted
 
 that he should execute a bond, and confess a judgment at law upon it, or pay she money,, Was there influence used to work upon the ap»
 
 *29
 
 prehension and fears of the old man, confessed by the answer to he near if not quite eighty years old, broken down by disease and mental torture ? In Twyítg’s case, 3d part of Lord Coke’s Rep. 81, it was ruled, that the deed in that case had signs and marks of frand; and the third resolution is, that it was made in secret,
 
 et dona clandestina sunt sem-per suspiciosa:
 
 and on the same page, in applying the Statute of 13 Eliz. to the case, he advises, that, where a gift is made in satisfaction of a debt, by one who is indebted to others, “let it be made in a public manner, before the neighbors, and not in private; for secrecy is a mark of fraud.” The defendant declares himself unable to say that any one was present beside the parties to the deed, and that his brother Samuel witnessed it. I repeat, then, that the answer is in itself sufficient to set aside the conveyance.
 

 Let us now look into the proofs. The bill of sale has upon it no legal probate. It was admitted to probate upon, the proof of the handwriting of the subscribing witness. The act of 1836, ch. 37, sec. 4, declares, that where the subscribing witness to a deed conveying slaves is out of the State, his deposition shall -be taken, unless he be dead. Where the subscribing witness is, we are not informed, except that he has left the State, and there is no evidence of his death. As .the defendant’s whole claim rests upon that deed, we might- have been justified in deciding the cause upon that point; but we have not chosen to do so, because •a case of such utter baseness required a full examination..
 

 The defendant -says that, at the time of the alleged set'.tlement, his father was indebted to him for money paid, &c. Upon examination of the proofs, we question whether his father owed him anything: or if so, the sum was small. Among the exhibits is a deed of trust, made by the old man on 26th of May, 1846, to George Simpson, of a tract of 'land, to secure a debt of f 60‘0, as due to Joseph Allen, the .defendant. At that time, then, we have a right to presume
 
 *30
 
 that sum to be the amount which the father owed the son.. It is not probable that, if the old man owed him in addition thereto, the sum of $1,100, it would have been omitted in the trust. The testator died the last day of February, 1849. In the short space of two years and nine months, we are called upon to believe that his indebtedness had reached the sum of $1425. This is not to be believed. The only evidence of subsequent indebtedness are the hundred dollar note in bank, paid by the defendant, and the two receipts from W. Donnell, a constable, in August 1846, for $4 94, the other in March 1847, for $3, contained in the constable’s. deposition, and paid by the defendant Joseph, and two judgments, amounting to about $500. In July 1847, two months after the execution of the deed of trust, a contract in writing, and under the seals of the parties, was made between the father and the son, leasing to the latter a tract of land, called the Indian town tract, at the yearly rent of $100, and to endure during the life of the old man. At the time of the old man’s death in February, the defendant owed him rent for eighteen months, or $150. Again, on 18th September, 1848, the old man sold and conveyed to .the defendant a tract of land lying on the waters of Hogan’s creek, for the sum of one thousand dollars, for $300 of which he was to have a credit of three years, and the balance was consequently duo immediately. This was six months before the father’s death. Those facts are mentioned to show the conclusion to which we have come, that the whole transaction, upon which the defendant relics, is a gross fraud.
 

 We will now turn to an examination of the testimony in the case, and we venture to say that a more disgraceful and unprincipled case never was disclosed in a Court of Equity. The proofs all agree, that at the time the alleged settlement took place, Joseph Allen, sr., was eighty years of age; that he had been in declining health for some time, and
 
 *31
 
 confined to his bed, and though possessed of legal capacity,, was weak in mind.
 

 In Mr. Edwards’ deposition, a reference to the bond for $1,425 is contained and identified; it is dated 14th of February, 1849. On that day, he states, he went to the old man’s house, and on his way met the defendant Joseph, with the negroes in dispute; and on the same day, he understood the other sons, Charles, Henry an^ Samuel, had taken off' the negroes they claimed. He found the old man setting up in a chair, and unable to get to his bed. He called for some of the negroes to help him, and he neither saw or heard any, and he was obliged to aid him himself. He describes his situation as loathsome in the extreme.
 

 Mary Allen testifies, that, on the day preceding the night when the old man died, Joseph Allen came to the old man’s house, and told him he- had come to get him to confess a judgment. The old said he was not able to go; he then said,
 
 “
 
 send my negroes home to wait on me.” He wanted Lizzie to put clean clothes on him, for Elisha’s wife was not able to wait on him; then said: “ Joe, they tell me you have bills of sale for them; if you have, you know you have forged them, you, or any of the rest of them, for they are mine during my life time, and then, they are Becky Wilson’s.” Joseph, Jr., replied: “ Daddy, you know they are to be refund back.” In answer to a question by the defendant, she stated, that when the old man was told, that his son Joe had taken the negroes off, he said, he
 
 “
 
 must bring them back, he wanted them to wait on him, he had it to doand he said it at different times.
 

 Elisha Allen testifies, that he knew nothing about any settlement, or the old man’s giving the bond.
 

 The testimony is very voluminous, more than throe fourths of it as to the mental capacity of the old man, and the character of the defendant Joseph, and the different witnesses: only such portions of it are recited, as bear upon the question of fraud.
 

 
 *32
 
 It Will be seen, that the bond itself conflicts with an allegation of the answer. The latter states, that the bond and bill of sale wore given the same day; the bond on the contrary bears date on the 14th of February, and the deed on the 17th, and the testimony of Mr. Edwards shows that it was on the 14th, that he met the defendant carrying-off the negroes. The defendant further states, that when the deed was executed, that Samuel Allen was at his father’s, and Elisha Allen also.. If this was the fact, why was not the latter called on to witness the settlement of their accounts, and the execution of the bond and the bill of sale ? Was it not, because tbe defendant knew that his brother Samuel Allen was about to leave the State, and that Elisha would remain. ? Elisha in his deposition states, that he knew nothing of any settlement or bill of sale; he was absent from home at the time. Again, it is proven by Mrs. Mary Allen .and Elisha, that the old man told Joseph, in their presence, the day previous to the night of his death, that if he had any bill of sale for the negroes, he had forged it. And what was his answer ? Did he claim the negroes as his, by a purchase from him ? No ; — his answer was,
 
 u
 
 Daddy, you know they are to be refund back.” It cannot be alleged that he was restrained by any sense-of feeling for his aged parent’s situation; for when he came, he commenced by telling him that he had come to get him to ,go and confess a judgment.
 

 But it is said that his father then owed him large sums of money — upwards of six hundred dollars. Mr. Thompson’s deposition (a witness for the defendant) proves payments by the defendant for his father to the amount of four ■or five hundred dollars, and Mr. Mann .and his wife prove ■declarations made by the old man .that he did owe his son; .but neither of them specify any amount. The payments proved .by Mr.. Thompson were made in the fall of 1846., .near .three years before the old man .died,
 

 
 *33
 
 Two objections arise as to the correctness of this charge by the defendant. The first is that, according to the an? swer of the defendant, they had a full and fair settlement on 14th of February, 1849; but a more effectual one is that pn 18th of September, 1848; the old man sold a tract of land to Joseph for $1000, upon which he was to have a credit of three years, for $300. Noy, from the disclosures of this case, we cannot for a moment believe, that, with a valid, honest claim against his father for upwards of $600, he would have paid him $700. It cannot be. Aman that ,can bring an account against a father for
 
 attentions
 
 to him while side, .certainly puts no ordinary value upon money.
 

 We have looked carefully through the testimony on file in favor of the .defendant. There is none of it calculated fo show that the alleged purchase wys a fair and
 
 bona fide
 
 .one. We put very little faith in the testimony of either Mr. or Mrs. Mann. That of the former is in .direct contrar .diction with the declarations of the old man, ma.de to the defendant, on the .day of his death, that if the latter had a bill of sale for the negroes, it was a forgery: and with his .orders to send them home, .and his promise to do so. Ori the truth of Nancy Allen's testimony, we cannot rely. She ¿went to the place, yher.e the deposition yas taken, in the de;-fendant’s buggy with him, and states she never told him what she could prove, and
 
 that they had no conversation ,,during the ride about the suit.
 
 She proves rather too much, .and by so .doing destroys the effect of her testimony. But let all this testimony be true, it does not show that any settlement took place between the father and son, as alleged, inferentially, in the answer pf the latter; and admitting that the old man did execute the bill of sale for the slaves jn contest, it is clear that it was not obtained for any valuar ble consideration, or
 
 bona fide;
 
 and believing from the whole testimony that it was fraudulently obtained, we are bound fo declare that the defendant Joseph Allen is a trustee for
 
 *34
 
 the plaintiff, and answerable to her for the hire of the slaves from the death of the old man: and the plaintiff is farther entitled to a decree for the conveyance of the slaves to her with all their increase, if any, and there mast be a reference to the master, to take an account of the hires. A transaction more disgusting in its details, more revolting to humanity, and more pregnant with fraud, was never investigated in this Court. Mr. Donnell states that, in 1846, the old man owned property to.- the amount of twelve or fifteen thousand dollars. This, for a man in his station, was a large property, and at the time of his death, in Feb. 1849, his negroes were all gone. He was old and broken down by anxiety and disease, and confined to his bed, and on the last day of his mortal existence, his four sons strip him of his last negro,, and leave him in -his filth and misery, to die-the death of a brute!
 

 We cannot refrain fro®, expressing our disapprobation of the wide range taken in this case, in the examination of character as to the parties and to their relative property, and should a similar case occur, we shall be compelled to-refer the depositions to the Master, to strike out all such, questions, at the costs of the propounder of them.
 

 On -the hearing, many exceptions were taken to the relevancy of questions and answers, and the Court is, as in this case, called on to delay the hearing to dispose of them. Our usual practice has been, when the objections raised presented any difficulty, to reserve them. Rut we feel the force of the objection to this course, as calling upon the Court to examine testimony which is not competent. What effect it may make upon the mind of the most sound and correct, no-man can answer. To remove this difficulty, we have adopted rules which we hope will remedy the evil.
 

 Defendant Edwards is entitled to a decree for his costs» Decree for plaintiff against Joseph Allen, jr.